UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

JOSIAH D. SEALE,

Plaintiff,

v.

CHRISTOPHER NEWELL, TEAM FLEET FINANCING CORPORATION, BUDGET RENT-A-CAR SYSTEMS, INC., AND JOHN C. CRANLEY,

Defendants.

1:02-CV-0979 (NAM/RFT)

---

JOHN C. CRANLEY,

Third-Party Plaintiff,

v.

MASSACHUSETTS INSTITUTE OF TECHNOLOGY,

Third-Party Defendant.

---

**APPEARANCES** **OF COUNSEL:**

POWERS & SANTOLA, L.L.P
39 North Pearl Street
Albany, New York 12207
*Attorney for Plaintiff*

John H. Fisher, Esq.

FLINK SMITH, L.L.C.
23 British American Boulevard
Latham, New York 12110
*Attorney for Defendant and Third-Party Plaintiff Cranley*

Robert J. Coughlin. Esq.

FRIEDMAN HIRSCHEN MILLER & CAMPITO, P.C.
131 State Street, P.O. Box 1041
Schenectady, New York 12301-1041
*Attorney for Budget Rent-A-Car Systems, Inc., and Team Fleet Financing Corporation*

Paul J. Campito, Esq.

CARTER CONBOY CASE BLACKMORE MALONEY & LAIRD, P.C.
20 Corporate Woods Boulevard
Albany, New York 12211-2362
*Attorney for Third-Party Defendant Newell and MIT*

William J. Decaire, Esq.

**Norman A. Mordue, Chief U.S. District Judge**:

**MEMORANDUM-DECISION AND ORDER**

**I. INTRODUCTION**

This diversity action is based on an automobile accident which occurred on January 25, 2000, in Essex County, New York. At the time of the accident, plaintiff Josiah Seale was an undergraduate student at defendant Massachusetts Institute of Technology ("MIT") where he also worked in the university's Media Lab as a research assistant. Plaintiff was a passenger in a rented sport utility vehicle operated by defendant Christopher Newell, also an employee of the Media Lab, when their vehicle was struck head-on by a pick-up truck driven by defendant/third-party plaintiff John Cranley. As a result of the accident, plaintiff was injured. The present lawsuit seeks recovery against defendants for past and future damages based on alleged permanent disabilities plaintiff sustained as a result of the accident together with lost wages and medical expenses.

Presently before the Court are three motions. Defendant Newell and third-party defendant MIT move for summary judgment on the ground that because plaintiff and Newell were allegedly in the course of their employment at MIT at the time of the accident, the present action is barred under the workers' compensation statutes of both New York and Massachusetts. Further, Newell and MIT assert that New York and Massachusetts law bars the third-party action and all cross claims asserted herein. Defendants Team Fleet Financing Corporation and Budget Rent-A-Car

Systems, Inc. also move for summary judgment on the ground that since defendant Newell allegedly rented the vehicle involved in the accident in his capacity as an employee of MIT and the accident is alleged to have occurred in the course of he and plaintiff's employment, the workers' compensation law of both New York and Massachusetts prohibits the claims raised against these defendants by plaintiff. Finally, defendant/third-party plaintiff Cranley has filed a motion for summary judgment on the ground that he acted reasonably during "an emergency situation not of his own making" and that the actions of defendant Newell were the sole and proximate cause of the accident at issue herein.

**II. RELEVANT FACTUAL BACKGROUND**

Plaintiff was employed by third-party defendant MIT as a paid research assistant in the Media Lab pursuant to the university's Undergraduate Research Opportunity Program ("UROP"). MIT's Media Lab was funded in part by the Defense Advanced Research Project Administration ("DARPA"), a military agency. Plaintiff participated in UROP via the Media Lab as both a freshman and sophomore at MIT. In order to be qualified to participate in UROP, plaintiff was required to submit a proposal or application to the Media Lab which identified a project he would be working on and a faculty supervisor to review his work. In the spring semester of the 1998-1999 academic year and the fall semester of the 1999-2000 academic year, plaintiff worked for the Media Lab via UROP for his faculty advisor, professor Michael Hawley, who taught media technology. Defendant Christopher Newell was Hawley's administrative assistant at the Media Lab.

In the course of his participation in UROP, plaintiff worked on a project which he described as related to "integration of technology into the home, and specifically the kitchen."

Specifically, plaintiff was working to develop a “digital nose” which could differentiate wines electronically and detect various smells associated with baking in order to alert that items baking in an oven were in danger of burning. Plaintiff denies that he worked on any other projects at the Media Lab from January 1999 through January 2000. Plaintiff was paid on an hourly basis for work completed for the Media Lab. Plaintiff avers in his affidavit submitted in opposition to the present motions that he was required to complete a time card for work done at the Media Lab each week before he was paid.[1] Plaintiff denies and the record is devoid of evidence that he received compensation for any work done for the Media Lab between December 1999 and January 2000.[2]

During MIT’s semester break in January 2000, plaintiff attended a group meeting at the Media Lab where a trip to Lake Placid was discussed in connection with a cross country skiing project. Plaintiff avers that he knew nothing about the cross-country skiing project, nor did he work on or have any intention to work on this project prior to his accident.

On the other hand, plaintiff’s supervisor at the Media Lab testified that all of the various

---

1 Defendant Newell and third-party defendant MIT argue that plaintiff’s affidavit concerning the issue of his preparation of time cards is an attempt to alter his deposition testimony. Specifically, they claim that plaintiff testified during his deposition that on one occasion, after the accident in this case, he was paid for work completed for the Media Lab during a trip to France without completing a time card. To the extent that such a fact is even relevant to the Court’s inquiry of plaintiff’s history of employment and compensation **before** the accident, the Court does not agree that this alleged “inconsistency” is clear evidence of an attempt by plaintiff to contradict his deposition testimony.

2 Defendant Newell and third-party defendant MIT contend in their motion papers that plaintiff’s response to interrogatories contradicts his assertion that he received no compensation during this time period. Specifically, these parties assert that plaintiff claimed he received a “stipend” for the period September 1999 to January 2000 in the amount of $4,860.00. The Court notes, however, that the plain meaning of the word “stipend” suggests it was money set aside or awarded to plaintiff which he was thereafter required to earn. Thus, the fact that plaintiff had a stipend during this time period is not dispositive of whether he actually earned any wages.

research projects underway were related and connected and that students were not necessarily as isolated in their work as suggested by plaintiff. Indeed, plaintiff was one of several students working for the Media Lab as part of a research group Hawley headed called the Personal Information Architecture ("PIA") group. According to Professor Hawley, all students working in the PIA group were working on the "same technological platform" but exploring different applications of the technology. Specifically, Hawley explained that "we had a rich common pallet of technology that was being thrown at a very liberal array of projects and so the same sorts of sensing and systems that were being built into the kitchen were tweaked and pushed into domains like skiing or plant biology or geology work on Mount Everest or motorcycle racing in Spain. So, they were all variations on the same theme." All students were expected, as part of the learning process, to take initiative on all research, technology and project work underway within the PIA group. Based thereupon, Professor Hawley testified that "when [plaintiff] jumped on the bandwagon for the ski project, we were delighted."

According to plaintiff, the Lake Placid trip was discussed for the first time in his presence at a PIA group meeting in early January 2000. Plaintiff denies that he attended the meeting to discuss the trip. Plaintiff testified that at one of graduate students at the meeting announced that the planned trip would be a "waste of time" since the research project related to visiting Lake Placid had not progressed far enough along to make the trip worthwhile. Plaintiff avers that an administrative assistant in the Media lab then said that the trip was already booked and would have to be paid for in any event. Plaintiff then mentioned that he would like to go if the hotel rooms were already paid for and would not be used. Plaintiff's affidavit says the administrative assistant replied "Sure, why not" and "We might as well go." The trip was scheduled for January 25, 2000. There is little and/or conflicting evidence concerning who participated in the trip and

the exact nature and scope of planned activities. There is also no clear indication of what supplies and/or equipment was purchased for or brought on the trip. Indeed, defendant Newell recalled few substantive facts during his deposition concerning either the planning of the trip or the accident.

The accident occurred at approximately 8:50 p.m. on State Route 73, a two-lane highway, in the Town of Elba. At that time, defendant Newell was driving the rented SUV westbound while defendant Cranley was operating a pick-up truck in the opposite eastbound lane. Both Newell and Cranley testified that it was snowing heavily before the accident which made visibility poor. The road was also covered with snow which made driving conditions poor. Prior to the accident, Cranley left work in Upper St. Regis where he was renovating a camp and drive toward his home in Keene Valley. On the way home, he stopped at Bowl Winkles bar and bowling alley in Lake Placid. During his deposition, Cranley could not provide even an estimate as to the time he left work on the date of the accident, nor does he recall how long it took him to drive from Upper St. Regis to Lake Placid.[3] He said "it was snowing" so he was "taking [his] time." Cranley did acknowledge consuming "a couple of [Labatt Blue] beers"[4] during the time he was at Bowl Winkles which he estimated to be "less than an hour" but "more than fifteen minutes." He did acknowledge that he was at Bull Winkles within one hour of when the accident occurred. After leaving the bar, Cranley stopped at a convenience store to purchase milk and beer. He denied knowing how much time elapsed between leaving the bar and being involved in

3 Cranley denied that the page of the "logbook" he kept in his pocket at all times to make notes about work "as [he] did stuff during the day" which stated "7:05 a.m. to 6:00 p.m." under "Tuesday, 1/15, 2000" referred to the hours he worked on the date of the accident.

4 Cranley estimated that he had "two" beers or "three possibly."

the accident or what the distance was from Lake Placid to Elba, New York.[5]

While driving on Route 73 from the convenience store toward his home in Keene Valley, Cranley said he was driving "extremely slow" because there was "a ton" of snow on the road. He first observed the SUV operated by defendant Newell as it rounded a curve in the opposite lane. Cranley noted that the headlights of the Newell "kind of shined" in the direction of the South Meadow Farm Lodge so Cranley thought the vehicle was going to make a left-hand turn into the Lodge entrance. However, he recalled thinking that the vehicle "was going too fast." It was only a matter of seconds after making this observation that the accident occurred according to Cranley. Newell testified that although driving conditions were poor, he had "no problems" operating his vehicle in the westbound lane of Route 73 prior to the accident. However, in the moments before the impact, the SUV "fishtailed" and traveled into the eastbound lane where the passenger side of the SUV impacted Cranley's truck. Newell stated that the accident "happened so fast" he could not say how far away Cranley's truck was when he first saw it, how long after seeing the Cranley vehicle that he impacted it or whether the Cranley vehicle took evasive action to avoid the collision.

The accident caused significant damage to the passenger side of the Newell SUV and it was apparent that plaintiff was seriously injured. Cranley asked a woman who lived nearby to call 911 and Newell tried to cover up plaintiff so he wouldn't get cold. The New York State Trooper who investigated the accident later arrested defendant Cranley for suspicion of driving while impaired or intoxicated. According to the bill of particulars Trooper Nathan Crudele

5 During his deposition, Cranley acknowledged that 7 miles "could be" a reasonable estimate, but he "never measured it." However, Cranley did know: 1) that road signs indicated it was 14 miles from Lake Placid to Keene Valley; and 2) Elba was half way between these villages.



N A M

prepared regarding the arrest, he noted at the scene of the accident and upon subjecting Cranley to field sobriety tests, that Cranley had an "odor of alcoholic beverage" on his breath, his eyes were "glassy" and he had "impaired motor coordination."[6] Cranley also admitted to Crudele that he had been drinking within one hour of the accident at Bowl Winkle and that he had consumed two to three beers. Crudele did not arrest Cranley at the scene, however, due to the fact that he was injured. Cranley declined offers by emergency personnel to be transported to a hospital. Matt Colby, a volunteer fireman who knew Cranley, later drove him to the Adirondack Medical Center ("AMC") from the accident scene. However, Cranley testified that after Colby dropped him off, he walked home to a house he had recently purchased in Lake Placid without seeking treatment because "[he] didn't feel hurt."

When he got to his house, Cranley "sat down, shook it off and had a beer." In the first fifteen minutes after arriving home, Cranley testified that he drank two to three cans of Budweiser beer in order "to relax." Then, Cranley stated, he "started to ache" and decided to return to the hospital. When Trooper Crudele interviewed him at the hospital, Cranley did not tell him that he had consumed additional beers after the accident. According to the results of a blood test administered at AMC at 11:15 p.m., approximately two hours and twenty-five minutes after the accident, Cranley's blood alcohol concentration was 0.10%. Knowing he had consumed

[6] Cranley testified that in addition to subjecting him to the field sobriety test, a "state trooper" administered a breathalyzer test and told Cranley "You're fine, don't worry about it." In stark contradiction, Crudele, the primary investigating officer at the scene, testified that his vehicle was not equipped with breathalyzer equipment nor was he trained on the use of it. Crudele could not recall if he or the other officer on the scene, Trooper Donovan, had alcosensor equipment with them since not all state police vehicles at the time of the accident were so equipped. However, Crudele did not administer a breathalyzer or alcosensor test on Cranley at the site of the accident nor did Donovan. Further, Crudele said no other law enforcement officer conducted a breathalyzer or additional field sobriety testing on defendant Cranley.

additional beers after the accident, Cranley did "not think about" telling the Troopers at the hospital who asked him for a blood sample that his blood alcohol analysis might be inaccurate. Nor apparently, did Cranley make any statements about consuming additional alcohol after the accident in an affidavit prepared by his attorney in connection with the criminal charges he faced in this case. There is no evidence in the record concerning disposition of the charges in the Town of Elba Justice Court.

Trooper Crudele testified that after investigating the accident at issue herein he determined that the primary contributing factor concerning defendant Newell's involvement in the accident was unsafe speed while slippery pavement was a secondary contributing factor. Insofar as defendant Cranley's involvement in the accident, Crudele testified that alcohol was the primary contributing factor. As a result of the accident, plaintiff alleges that he sustained significant injuries including a basilar skull fracture, an open tibia/fibula fracture of his right leg, multiple facial fractures and a jaw fracture. In addition, plaintiff contends that as a result of the accident he sustained a severe traumatic brain injury which has resulted in significant cognitive deficits.

At the time of his depositions in December 2004 and March 2005, plaintiff was married and was attempting to complete his undergraduate degree at MIT. He had applied to graduate schools at Yale and Columbia, and was accepted. Nevertheless, plaintiff alleged that due to the continuing effect of injuries sustained in the accident, he had difficulty managing his academic responsibilities. Plaintiff claims that as a result of the accident, he suffers from *inter alia*, cognitive deficits, lingering orthopedic problems with his leg, dental problems, bowel and bladder weakness as well as sexual dysfunction. Defendants dispute the extent of plaintiff's permanent injuries, noting his academic record and testimony from Professor Hawley that when plaintiff



N A M

returned to school and to work in the Media Lab, he did not show any signs of cognitive difficulties.

Plaintiff states that at no time did he file a claim for or accept workers' compensation benefits although he did receive from and return to MIT information about workers' compensation insurance and an authorization for the university's insurance carrier to release his medical records. The workers' compensation carrier for MIT has paid a significant portion of plaintiff's medical expenses. However, plaintiff testified that when MIT's insurance carrier sent him a number of checks to compensate him for lost wages, he gave the checks to his lawyer.

**III. DISCUSSION**

A. Choice of Law

Defendant Newell and third-party defendant MIT contend that Massachusetts law applies to the present lawsuit based on the choice of law principles articulated in *Neumeier v. Kuehner*, 31 N.Y.2d 121, 128 (1972). Defendant Cranley objects to the analysis of movants Newell and MIT, asserting that since there is no conflict between Massachusetts and New York insofar as the legal issues involved herein, the law of the forum state - New York - should apply. Plaintiff makes no arguments in connection with the choice of law issue.

The law is well-settled that a federal court sitting in diversity applies the choice of law rules of the forum state. *See Int'l Business Machines Corp., Inc. v. Liberty Mut. Ins. Co.*, 363 F.3d 137, 143 (2d Cir. 2004) *(citing Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d Cir. 1988)). In tort cases like this, New York applies the law of the state with the most significant interest in the litigation. *See Padula v. Lilarn Properties Corp*., 84 N.Y.2d 519, 521 (1994). In weighing interests, New York distinguishes between "conduct regulating" and "loss allocating" rules. *See Sheldon v. PHH Corp*., 135 F.3d 848, 853 (2d Cir. 1998). If conduct regulating rules are in

conflict, New York law usually applies the law of the place of the tort (*" lex loci delicti"*). *See id.* (citing *Padula*, 84 N.Y.2d at 522, 620 N.Y.S.2d at 311). However, if loss allocating rules conflict, the choice of law analysis is governed by the so-called *Neumeier* rules. *See Sheldon v. PHH Corp*., 135 F.3d 848, 853 (2d Cir. 1998) (citing *Neumeier*, 31 N.Y.2d at 128; *Padula*, 84 N.Y.2d at 522)). *Neumeier* established three rules that take into account the domicile of the parties, the conduct at issue, and the purposes of the substantive law. *Caruolo v. John Crane, Inc*., 226 F.3d 46, 57 (2d Cir. 2000) (citing *Neumeier*, 31 N.Y.2d at 128).

However, it is also true that choice of law does not matter unless the laws of the competing jurisdictions are actually in conflict. *See Int'l Business Machines Corp., Inc*., 363 F.3d at 143 (citing *In re Allstate Ins. Co. ("Stolarz")*, 81 N.Y.2d 219, 223 (1993). Laws are in conflict "[w]here the applicable law from each jurisdiction provides different substantive rules." *Id.* (quoting *Curley*, 153 F.3d at 12 (citing examples)). In the absence of substantive difference, however, a New York court is free to dispense with choice of law analysis and apply New York law. *See id.* (citing *J. Aron & Co. v. Chown*, 231 A.D.2d 426, 426 (N.Y. App. Div. 1996) (affirming application of New York law where there was no actual conflict with the substantive law of Newfoundland); *Tronlone v. Lac d'Amiante Du Quebec*, 297 A.D.2d 528, 528 (2002), *aff'd* 99 N.Y.2d 647 (2003) (affirming application of New York law where there was "no relevant conflict" between the substantive laws of New York and New Jersey)).

Critical to the ultimate determination of plaintiff's claims is whether the accident in this case occurred within the scope of plaintiff's and defendant Newell's employment at MIT. Assuming they were **not** in the course of employment, the law of New York, the forum state, should apply to the question of who is at fault for the accident itself. The Court does not discern a difference between New York and Massachusetts law insofar as determination of negligence

issues nor have the parties alerted the Court to one. Moreover, the law of negligence is conduct-regulating and would be governed by the principle of *lex loci delicti* in the event of a conflict. Thus, under either scenario, the law of New York will apply to the parties' conduct in either causing or failing to prevent the automobile accident.

In this case, there is no evidence in the record which suggests that plaintiff filed or pursued an actual workers' compensation claim in Massachusetts. Thus resolution of the questions of whether plaintiff and Newell were in the scope or course of employment at the time of the accident are not before an administrative workers' compensation board and rest exclusively with this Court. Assuming that the accident **did** happen in the course of both plaintiff's and defendant Newell's employment, the Court can discern no issue **- on this record -** which would be determined differently under limitation of liability laws of one state versus the other. Indeed, the parties have not highlighted any significant differences between New York and Massachusetts law insofar as determining whether an accident or injury is work-related. *See Mulford v. Mangano*, 636 N.E.2d 272, 274 (Mass. 1994) ("An employee has acted in the course of employment whenever he has . . . engaged in conduct consistent with his contract of hire and pertinent or incidental to his employment"). Furthermore, an employee has acted in the course of employment even if he has more than one purpose for doing an act, "as long as one significant purpose is related to the employment." *Mendes v. Tin Kee Ng*, 507 N.E.2d 1048, 1051 (Mass. 1987). "With respect to an employee's trip or journey, the test is 'whether the employment or something else sent the employee on the journey.'" *Id.* (citation omitted). Similarly, New York law on this issue was summarized by Chief Judge Cardozo of the New York Court of Appeals as follows:

> If the work of the employee creates the necessity for travel, he is in

> the course of his employment, though he is serving at the same time some purpose of his own (citation omitted). If, however, the work has had no part in creating the necessity for travel, if the journey would have gone forward though the business errand had been dropped, and would have been canceled upon failure of the private purpose though the business errand was undone, the travel is then personal, and personal the risk.

*Matter of Marks v. Gray*, 251 N.Y. 90, 93-94 (N.Y. 1929).

As a further matter, both Massachusetts and New York have an exclusivity provision in their respective workers' compensation statutes which prevents injured employees from pursuing any action at common law against their employers for injuries sustained in the course of employment. *See* N.Y. Workers' Comp. Law §§ 11, 29(6); Mass. Gen. Laws ch. 152, § 24. New York's workers' compensation statute explicitly prohibits suits by an injured employee against a fellow employee for injuries arising in the scope of employment. *See Heritage v. Van Patten*, 59 N.Y.2d 1017, 1019 (N.Y. 1983). Under Massachusetts law, the Workers' Compensation Act likewise bars an employee injured in the course of his or her employment by the negligence of a fellow employee from recovering from that fellow employee if the fellow employee also was acting in the course of employment. *Anzalone v. Massachusetts Bay Transp. Auth.*, 526 N.E.2d 246, 250 (Mass. 1988).[7] Moreover, both Massachusetts and New York law appear to bar claims by a plaintiff injured employee against the owner of a vehicle operated by the injured plaintiff 's

---

[7] In Massachusetts, the co-employee immunity rule under Gen. Law. ch. 152 involves the same "course of employment" standard that determines whether an employee is acting in the course of employment and thus is entitled workers' compensation. *See Mulford*, 636 N.E.2d at 274. "Compensation is available, pursuant to Mass. Gen. Law ch. 152, § 26 (1992 ed.), to an employee (who has not preserved his common law rights) who receives a personal injury "arising out of and in the course of his employment." *Id.* If "compensation benefits are available under Mass. Gen. Law ch. 152, an employee injured in the course of his employment by the negligence of a fellow employee may not recover from that fellow employee if he also was acting in the course of his employment." Id. (citing *Saharceski v. Marcure*, 366 N.E.2d 1245, 1247 (Mass. 1977). In Massachusetts, if an employee does not expressly reserve his rights to sue under the common law for work-related injuries at the time of hiring, he is also barred from commencing an action against a fellow employee for an intentional tort which did not occur in the course of employment. *See Anzalone*, 526 N.E.2d 246, 250 *id.*; Mass. Gen. Laws ch. 152, § 24.

fellow employee. *See Nat'l Union Fire Ins. Co. of Pittsburgh v. Figaratto*, 667 N.E.2d 877, 879 (Mass. 1996) (owner of vehicle operated by injured plaintiff's fellow employee cannot be sued on theory of vicarious liability); *Kenny v. Bacolo*, 61 N.Y.2d 642, 645 (N.Y. 1983) (same).

Defendant Newell and third-party defendant MIT contend that New York law provides an exception to the exclusivity provision of the workers compensation law whereby an injured employee can sue his employer in the case of a statutorily defined "grave injury." This argument misapprehends the applicable law because on its face, the "grave injury" exception only applies to claims against employers by a **third person** (not the injured claimant) based on **contractual contribution or indemnification** for the type of loss suffered by the claimant. *See* N.Y. Workers Comp. Law § 11. In this case, there is no claim of contractual contribution or indemnification. Thus, the "grave injury" exception is inapplicable to the facts herein and does not represent a "conflict of laws" for resolution by the Court.

Plaintiff denies that he applied for or collected workers' compensation benefits and thus he claims his rights herein are unencumbered by the exclusivity bar of Massachusetts workers' compensation law. As referenced above, it appears that in Massachusetts, unlike New York, while providing workers' compensation insurance is compulsory for employers, accepting the protection of the insurance is only elective for employees.[8] In Massachusetts, workers have the right to forego the protection of workers' compensation coverage at the outset of employment in favor of common law remedies. Plaintiff, however, does not claim, nor is there evidence in the record which suggests, that plaintiff so reserved his common law rights. Thus even if plaintiff did

8 New York law does not provide an employee with the choice of reserving common law rights. Specifically, New York Workers' Compensation Law § 11 provides that the liability of an employer under the state's workers' compensation statute "shall be exclusive and in place of any other liability whatsoever."

not apply for or accept workers compensation benefits, he did not expressly "opt out" of this insurance coverage or reserve his common law rights at the time he was hired at MIT. *See Anzalone*, *supra*, 526 N.E.2d at 249 (Workers' Compensation Act bars any recovery at common law for personal injuries occurring within the scope of employment unless written notice reserving such rights was given to the employer at the time of hire).

Based on the above, it is clear that if the accident in this case occurred in the course of plaintiff's and Newell's employment at the Media Lab, the prohibitions against plaintiff suing MIT or employees of MIT for injuries sustained within the scope of his employment would be in equal effect under New York and Massachusetts law. The Court cannot discern a conflict of laws between the states of New York and Massachusetts concerning limitation of liability insofar as the facts presented on this record. Moreover, it is not clear yet in any event, as further discussed below, that the moving defendants are entitled to the limitation of liability they claim herein. Consequently, the Court finds it unnecessary to engage in a conflict of laws analysis as requested by defendants Newell, Team Fleet, Budget Rent-A-Car and third-party defendant MIT.

B. Summary Judgment Standard

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56©. Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 258 (1986). Irrelevant or unnecessary facts do not preclude summary judgment, even when they are in dispute. *See id.* The moving party bears the initial burden of establishing that there is no genuine issue of material fact to be decided. *See Celotex Corp v. Catrett*, 477 U.S. 317, 323 (1986). With respect to any issue on which the moving party does not bear the burden of proof, it may meet its burden on summary judgment by showing that there is an absence of evidence to support the



N A M

nonmoving party's case. *See id.* at 325. Once the movant meets this initial burden, the nonmoving party must demonstrate that there is a genuine unresolved issue for trial. *See* Fed. R. Civ. P. 56(e). A trial court must resolve all ambiguities and draw all inferences in favor of that party against whom summary judgment is sought, *see Ramseur v. Chase Manhattan Bank*, 865 F.2d Cir. 460, 465 (2d Cir. Cir. 1989); *Eastway Constr. Corp. v. City of New York*, 762 F.2d Cir. 243, 249 (2d Cir. Cir. 1985). It is with these considerations in mind that the Court addresses the parties' motions for summary judgment.

1. Plaintiff's Remedies Against Defendants Newell, Team Fleet, Budget Rent-A-Car and Third-Party Defendant MIT

In support of their motions for summary judgment, defendants Newell, Team Fleet, Budget Rent-A-Car and third-party defendant MIT contend - and plaintiff denies - that: 1) he was in the course of his employment at the time of the accident in this case; and 2) he accepted workers compensation benefits as his exclusive remedy herein. For his part, plaintiff is seemingly dumbfounded concerning the basis for defendants' contentions that he went to Lake Placid for something other than "recreational purposes." Insofar as plaintiff's alleged acceptance of workers compensation benefits, plaintiff also claims utter ignorance on the question of how or why MIT paid a significant portion of his medical expenses.

The moving defendants have presented evidence that the trip to Lake Placid was organized by and paid for by the Media Lab as part of an exercise in research and/or teaching by way of witness testimony and deposition exhibits. According to Professor Hawley, there were many meetings of the PIA group in which the trip to Lake Placid was discussed since the trip had been planned for some time prior to January 2000. The objective of the Lake Placid trip was generally to train students in preparation for scientific expeditions by the group to Norway and Iceland where they planned to test the use of embedded sensors in cross-country skiing

equipment. Hawley's assistant, defendant Newell, testified that the purpose of the Lake Placid trip was three-fold: "to test equipment, to test the students and to bring the skills necessary for future trips up to speed." Hawley stated that although students were not assigned to do particular research or work on the trip, all students had to learn to organize, bring and use equipment as well as learn to ski.

It is undisputed that plaintiff received several e-mails about the plans for the trip from defendant Newell who was responsible for organizing the trip in Hawley's stead, making arrangements for accommodations and activities and purchasing all equipment and supplies needed for the trip. Two vehicles - one an MIT Media Lab minivan and the other an SUV rented by Newell - along with an undetermined number of students were involved in the trip.[9] Defendant Newell was the driver of the rented SUV and that plaintiff was his passenger. After leaving MIT on the date of the accident, plaintiff testified that Newell drove to a local ski shop and purchased whatever equipment plaintiff needed for the trip. Plaintiff said these items were purchased "for the Media Lab," but he was going to be allowed to use them for the weekend. Newell also said that the pair stopped at a camera shop prior to the accident where he purchased some additional equipment for the trip. Plaintiff recalled seeing skis, cases, bags or packages and his backpack in the back of the SUV. Newell testified that he had at least one pair of skis and some camera and/or video equipment in the vehicle in which he and plaintiff were traveling. Newell did not know what equipment was brought or packed in the MIT minivan.

Plaintiff insists that the "research part" of the Lake Placid trip had been "cancelled" before the accident. Although he knew "some people would be doing something" related to Media Lab

---

9 Newell rented the SUV as an employee of the Media Lab and later submitted a request for travel expense reimbursement which listed plaintiff, among others, as participants in a DARPA sponsored research trip to Lake Placid.

research while they were there, plaintiff insists that he personally agreed to go to Lake Placid purely for "recreational reasons." Plaintiff states in his affidavit that he had no intention of doing any work or research in Lake Placid although he testified during his deposition that he "d[id]n't know" and "c[ould]n't speculate" about whether he would have assisted with work, operated a video camera or worn a "body monitoring strap" while skiing at Lake Placid if a fellow researcher had asked. Both Hawley and Newell testified that they could not recall any discussion by the group of cancelling or limiting the Lake Placid trip. Both testified that the trip was for research and training in connection with Media Lab work.[10]

However, MIT's witnesses were less than forthcoming in providing a simple and straightforward answer to the question of whether plaintiff was on a work-related trip at the time of the accident. Non-party witness Michael Hawley seemed to have great difficulty understanding and/or answering questions concerning the specific nature of the work-related activities plaintiff was expected to participate in while visiting Lake Placid. Mr. Hawley could not state with any degree of certainty what projects plaintiff was or was not working on at the time of the accident. Moreover, Hawley seemed perplexed about why the questions were being asked in the first place. For his part, defendant Newell lacked clarity regarding virtually every detail associated with the Lake Placid Trip and the accident which is the subject of this lawsuit. Newell did not know who actually went on the trip, what was purchased or packed for the trip and what was planned insofar as Media Lab work. Newell did not know how long it took him to drive from Cambridge to the scene of the accident and besides stopping at a camera shop and a restaurant for take-out food, Newell could "not recall" whether he and plaintiff stopped anywhere

[10] Hawley also recalled that the PIA group's planned trip to Iceland occurred within "a week or two" of the accident in this case and the trip to Norway happened during the "same winter season."

else. The accident "happened so fast" he has no recollection of how or why it occurred.

In spite of the difficulties of MIT's witnesses in answering the question of whether plaintiff was en route to a work-related research expedition at the time of the accident, the Court finds substantial evidence in the record which suggests the trip to Lake Placid was not simply for recreation as claimed by plaintiff. Nevertheless, the Court is constrained to find that plaintiff's deposition testimony and affidavit are sufficient to create a triable question of material fact on this issue. In order to ascertain the applicability of their affirmative defense, the moving parties must await the outcome of plaintiff's attempt to convince a jury that this was not a work-related trip.

On the issue of plaintiff's acceptance of workers' compensation benefits, the record reveals that plaintiff received correspondence on more than one occasion from MIT concerning workers' compensation insurance and that plaintiff executed and returned to MIT an authorization for release of his medical information. However, plaintiff insists that he never filed a workers' compensation claim, accepted any lost wage payment from MIT's workers' compensation carrier or asked MIT to pay his medical expenses. As discussed above, plaintiff clearly did not "opt out" of workers compensation insurance or reserve his common law rights at the time of his hire. Nevertheless, as with the issue of plaintiff's work status at the time of the accident, the Court must conclude that triable questions of fact exist on this record concerning whether plaintiff accepted workers' compensation benefits as his exclusive remedy against defendants Newell, Team Fleet, Budget Rent-A-Car and third-party defendant MIT in this matter.

2. Defendant Cranley's Affirmative Defense

Defendant Cranley moves for summary judgment on the grounds that: 1) he acted reasonably in an emergency situation not of his own making; and 2) that the actions or inactions of defendant Newell were the sole proximate cause of the accident and plaintiff's injuries. In short, defendant Cranley argues, by way of an affidavit submitted by his attorney, that the SUV



N A M

operated by defendant Newell crossed into his lane of travel so quickly, he (Cranley) did not have time to react. The premise and procedural posture of Cranley's motion is suspect at the outset based on its failure to address or even mention the obvious factual issue of Cranley's admitted consumption of alcohol prior to the accident.

In any event, in opposition to Cranley's motion, plaintiff and defendants Newell and third-party defendant MIT refer to the testimony of Trooper Crudele who opined that Cranley's use of alcohol was the "primary contributing factor" to Cranley's involvement in the accident. The opposing parties also point to the experts retained by plaintiff who aver that defendant Cranley had more than sufficient time and distance to take evasive action to avoid the accident and that Cranley's consumption of alcohol impaired his ability to perceive oncoming traffic, operate his vehicle and/or take evasive action.

In response to these expert affidavits, defendant Cranley submits two of his own. John Serth, a licensed professional engineer opines that plaintiff's expert's conclusions regarding Cranley's ability to avoid the accident are internally inconsistent and violate the laws of physics. Further, Thomas Rosano, a forensic toxicologist retained by defendant Cranley, avers that the concentration of alcohol in Cranley's system at the time of the accident cannot be determined based on a blood alcohol measurement taken at 11:15 p.m., because : 1) alcohol absorption into the blood system varies from person to person; and 2) Cranley allegedly ingested additional alcohol after the accident. Mr. Rosano opines therefore that conclusions that Cranley's use of alcohol contributed to the accident are speculative and without scientific foundation. Based thereupon, defendant Cranley asks the Court to disregard plaintiff's experts pursuant to *Daubert v. Merrell Dow Pharmaceuticals,* 43 F.3d 1311, 1315-16 (9th Cir. 1995) and grant summary judgment in his favor.

The Court finds that defendant Cranley's motion plainly lacks merit. Indeed, even

assuming the opinions of plaintiff's experts are invalid, and even if Cranley's precise blood alcohol concentration at the time of the accident cannot be determined, his evidentiary submissions are not sufficient to dispel the clear material fact concerning the proximate cause of plaintiff's injuries. Mr. Rosano's opinion concerning the uncertainty of calculating Cranley's blood alcohol level at the time of the accident is based, in part, on Cranley's allegation that he consumed "two to three" beers at Bowl Winkles and additional beer after the accident. However, Cranley's own testimony on these issues raises triable question of fact. Given his lack of recollection concerning: 1) when he left work, how long it took him to drive to Bowl Winkles; 2) how long he stayed at the bar; 3) how much time elapsed between when he left Bowl Winkles and when the accident occurred, it is certainly possible that a jury could find Cranley consumed more than "two to three" beers at Bowl Winkles before the accident. Moreover, defendant Cranley's failure to mention to Trooper Crudele or anyone else at the hospital that he had allegedly consumed more beer after the accident, together with his apparent failure to raise this alleged fact in his criminal case, leaves ample room for a jury to question the veracity of this claim.

Moreover, Trooper Crudele, who is a fact witness in addition to being an expert, had the opportunity to observe defendant Cranley personally at the scene of the accident and determined that his use of alcohol was a "primary contributing factor" to his involvement in the accident. It is possible that defendant's Newell's actions or inactions in operating his SUV will ultimately be found to have been more careless than Cranley's. A jury could even find after resolving the clear credibility issues in this case that but for defendant Newell's actions, the accident would not have occurred in spite of Cranley's alleged intoxication. However, it is manifestly inappropriate for the Court to make these determinations at the present time. Defendant Cranley has failed to carry his burden of demonstrating that there are no triable issues concerning the proximate cause of the accident.

## IV. CONCLUSION

The record reveals that the legal strategies of the parties in this case have led to an unfortunate impasse. Counsel have apparently lost the required ability to consider the case or arguments from an alternative perspective making settlement of the case impossible. One lawyer commented during depositions that he “c[ould]n’t wait” for the Court to read the transcript. The transcripts have now been read and to say that there are significant credibility issues for a jury to resolve - on all sides - in this case is an understatement. The record is replete with testimony which strains credulity. Attorney affidavits, expert opinions and obstinate legal arguments cannot overcome the glaring questions of fact created by conflicting and, in some cases, frankly dubious assertions by key witnesses on the critical legal issues at bar. For the foregoing reasons it is hereby

ORDERED that the motion for summary judgment filed by defendant Newell and third-party defendant MIT is DENIED; and it is further

ORDERED that the motion for summary judgment filed by defendants Team Fleet Financing and Budget Rent-a-Car is DENIED; and it is further

ORDERED that the motion for summary judgment filed by defendant Cranley is DENIED; and it is further

ORDERED that to the extent plaintiff asserts that he made any motions in this case, e.g., for additional discovery or dismissal of affirmative defenses, such applications were not presented in accordance with the Fed. R. Civ. P. or the Local Rules of this Court and thus any “undocketed motions” on which plaintiff awaits determination by the Court are also DENIED.

IT IS SO ORDERED.

Date: September 27, 2007

Norman A. Mordue
Chief United States District Court Judge